## T. CLIFTON CLARY V. STATE.

No. 24314. June 1, 1949.
State's Motion for Rehearing Denied June 24, 1949.

*Runge & Hardeman,* of San Angelo, for appellant.

*O'Neal Dendy,* District Attorney, San Angelo, and *Ernest S. Goens,* State's Attorney, Austin, for the state.

HAWKINS, Presiding Judge.

Appellant stands convicted of the murder of his wife, Odilla Clary, and his punishment was assessed at confinement in the state penitentiary for 99 years.

It was the theory of the state, and it is upon such theory that this conviction is based, that the deceased came to her death by strangulation caused by blood forming and collecting

in her throat and lungs; that the blood was caused to so form by and as the result of some act or acts of unlawful violence to the person of the deceased by the appellant; that after the death of deceased, to conceal his crime, appellant set fire to and burned their residence in which the body of deceased was found. There was evidence to the effect that at the time of the death of deceased, appellant had become infatuated with another woman, which the state contended was a motive for the killing.

It was the theory of the appellant that deceased came to her death as a result of the accidental burning of the residence caused by some defect in the butane gas lines in or leading to the house.

The state's case depended upon the testimony of the county health officer and a toxicologist of the department of public safety of this state, who made an examination of the body of the deceased after it had been disinterred. The admissibility of this testimony was challenged by appellant.

The burning of the residence occurred early on the morning of January 31, 1948. On the same day and before the body or remains thereof had been removed, the justice of the peace of precinct No. 1 of Runnels County held an inquest in which he found that the deceased had come to her death as a result of accidental burning in a fire which destroyed her residence and sixteen days thereafter, or on the 16th day of February, 1948, the same justice of the peace who held the inquest ordered the disinterment of the deceased's body.

On the 4th day of March, 1948, the indictment in this case, charging appellant with the murder of Odilla Clary "by some means, instruments and weapons to the grand jurors unknown," was returned and filed in the district court of Runnels County.

Mrs. Mildred Blackstone was charged with making a false statement before the grand jury relative to her association with appellant, and was indicted and tried therefor and convicted. However, she was granted a new trial by the trial judge and was enlarged upon bail at the time of this present trial, it being shown that the sheriff had returned a subpoena for her herein as not found in such county.

A motion for a change of venue was filed by appellant at the proper time, and by the trial court overruled, and such ruling is made the basis of Bill of Exceptions No. 1. Such motion con-

tained the usual allegations that this cause had been prejudged by the qualified jurors of Runnels County, and that they were prejudiced against appellant. Evidence was introduced relative to the amount of publicity given the death of Mrs. Clary in the newspapers and over the radio, reflecting the death of appellant's wife, the disinterment of her body some days after her burial, the investigation of such death, the indictment of appellant by the grand jury, the indictment of Mildred Blackstone, her conviction for perjury, and the granting of a new trial in her case, articles in newspapers such as the Fort Worth Star-Telegram, the Abilene Reporter, and Ballinger Ledger, all alleged to have a large circulation in Runnels County, as well as many statements sent over a radio station in said county, the local newspapers carrying on a running account of each development in the progress of the autopsy of the body of the deceased amounting to a day-by-day chronicle of the efforts of the officers to find out the cause of deceased's death; the newspapers taking up the trial of Mildred Blackstone and publishing much of the testimony offered in the case against her for perjury, among such being the testimony of the foreman of the grand jury which indicted her that "* * * the evidence showed that she (Mrs. Clary) did not die from fire." There was also seen in such reports that Mrs. Blackstone had told Ranger Rohatsch that she had lived with appellant at her home from Sunday through Thursday of each week for a certain period of time, staying with him one time for eight nights at a certain drive-in court on the Ballinger Highway, and that she and appellant had planned to get married on or about January 15th at Yuma, Arizona; that "* * * she had never married in Yuma before." It was also shown in such reports that Mrs. Blackstone had told the district attorney that appellant stayed with her from Monday through Thursday following the fire, together with further portions of the testimony proven in the Blackstone trial, and the resultant conviction as well as a portion of the argument in said case.

We quote from Bill No. 1 as follows:

"The witness Jim Flyntt testified that he was sheriff of Runnels County for ten years, that he was well acquainted with the people of Runnels County, that he had heard many people from different sections of Runnels County discuss the case, that they had their minds pretty well made up on the case, and had an opinion on the case, that a good deal of prejudice exists against the defendant among the people in the county, that the ones he had talked to were prejudiced against the defendant, that he had heard more discussion about this case, and that

there was more prejudice in this case than any other since the Brown case which happened in 1910, that a few weeks theretofore Mildred Blackstone had been tried in Runnels County for perjury growing out of the Clary case, convicted, and the judgment set aside, and that the trial of that case and its relation to the Clary case provoked considerable discussion throughout the County."

Mack Setzer testified, among other things, that he had lived in Runnels County since 1905, and was well acquainted therein; that he had heard a great deal of talk about this case; that everywhere he went he heard the people talking about this case; that the majority of them had an opinion in the case, and some thought he was guilty and ought to be burned, and he thought appellant could not get a fair trial in such county.

Mr. Bissett, a service station operator, testified that he had lived in Ballinger for 14 years, had heard much discussion about this case, and had read about it; that a good many people had an opinion about it and thought he was guilty, and the witness did not think appellant could get a fair trial in that county.

Carl Lewis testified that he had been engaged in the grocery business at Norton in said county for about 17 years; that he had heard a good deal about this and the Blackstone case; that the people he talked to had an opinion in this case, and he did not think appellant could get a fair trial in Runnels County; that a large per cent of the people seemed to have prejudged the case against appellant.

Sheriff Moreland was the only witness offered by the state to controvert such motion. He testified that he had been sheriff of that county for eight years, had been pretty well over the county in the last few months; that he had not heard this case discussed; that he had not had time to discuss it, but from the discussion that he had heard, he believed a fair trial could be had.

R. E. Bruce testified that his radio station reached out 65 miles from Ballinger; that he had not heard anything to indicate that the people were particularly worried about the Clary case, one way or the other; that he had heard it mentioned casually but that he tried to dodge the conversation if he could; that he believed a fair jury could be obtained in Runnels County.

The motion for a change of venue was denied. Then the bill shows that 120 veniremen had been summoned for jury service.

Of these, 11 were excused because they had served on the Blackstone case; that 48 were excused because they had formed an opinion as to the guilt or innocence of appellant; that 25 were absent from the county, indisposed, over age, or for other causes, thus leaving 36 jurors out of the 120 originally called from which to select a jury. Fourteen were peremptorily challenged by the appellant and 11 by the state, and 11 were accepted for service; of these 11, all but 3 stated that they had some kind of opinion as to the guilt or innocence of the appellant.

Mr. Hensley, on his voir dire examination, finally answered to the following question, after having admitted that he had an opinion herein:

"Q. * * * you are a man of considerable affairs and you know what goes on pretty well all over the country and you have to make many snap judgments during the course of a day; you ought to know whether or not that opinion which you have, that fixed opinion which you have at this time as to the guilt or innocence of the defendant would influence your verdict in this case? A. Well, I still don't know how to answer it; the way I have it fixed in my mind I would have to hear evidence to the reverse of that before I would change it."

This juror was taken on the jury and signed the verdict as foreman thereof, and to a certain extent his testimony is rather typical of many of the venire.

It is noted that appellant exhausted all of his peremptory challenges and when the twelfth juror was presented, he requested the trial court to grant him a further peremptory challenge, and upon the court's refusal to do so, the twelfth juror, being a talesman, was accepted by the state and sworn in, thus completing the jury.

We are of the opinion that this Bill No. 1 evidences the fact that a large proportion of the county had formed an opinion relative to appellant's guilt herein, and unless such opinion was removed by the testimony showing his innocence, this cause had been prejudged therein. The disinterment of the body of the deceased, the appellant's conduct with Mrs. Blackstone, her trial and conviction for perjury, and the many publicity articles could not be expected to do anything else than inflame the minds of the citizenship of the county who had heard of the same, and naturally lead them to think as many prospective jurors said, that he was guilty. The venue of this case should have been changed to a proper county.

In the event of a further trial herein, we call attention to the recent amendment to Article 968, C. C. P., Acts of 50th Legislature, Chapter 369, p. 745, and the last paragraph thereof, wherein the unavailability, the failure, or the refusal to act in such inquest of the justice of the peace of the justice precinct wherein Mrs. Clary died, should have been shown in order to render the acts of justice of the peace of Precinct No. 1 available as testimony.

For a failure to change the venue herein to some county other than Runnels County, as complained of in Bill No. 1, this judgment is reversed and the cause remanded.

## ON MOTION FOR REHEARING.

KRUEGER, Judge.

The state, by and through its district attorney, has filed a brief motion for a rehearing herein in which it is contended that we erred in two respects in reversing the judgment of conviction.

Its first contention is that we erred in holding that the jurors trying the case had prejudged it; and second, that the juror, Duncan Hensley, had a fixed opinion in his mind as to appellant's guilt. These questions were thoroughly considered and discussed by all the members of the court and the opinion written by Presiding Judge Hawkins clearly and definitely expresses the unanimous opinion of the court. No reason is advanced by the state in its motion why the court erred. It is merely a general statement by the district attorney.

Being convinced that the case was properly disposed of on the original submission, the motion for rehearing is overruled.

Opinion approved by the court.